CHARLES H. HAGERTY v. Q. N. EVANS and Another.[1]

November 21, 1902.

Nos. 13,185—(120).

**Master and Servant—Defective Scaffold.**

Where a scaffold is required for the purpose of sustaining the workmen and also the strain of hoisting up sections of heavy iron pipe, the weight of such pipe, and the additional weight caused by bracing up the pipe after being put into place, presumptively the ordinary workman,

[1] Reported in 92 N. W. 399.

not familiar with the construction of scaffolds, and having no experience in such work, is not able to judge of the sufficiency of the appliance for such purpose. In such case, if the master directs such workman to go upon the scaffold and assist in handling the pipe, there is an implied agreement upon his part that the same is reasonably safe and suitable for the purpose.

Action in the district court for Freeborn county to recover $2,000 for personal injuries. The case was tried before Kingsley, J., and a jury, which rendered a verdict in favor of plaintiff for the sum demanded. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Trafford N. Jayne* and *H. C. Carlson,* for appellants.
*Morgan & Meighen* and *H. H. Dunn,* for respondent.

LEWIS, J.

The defendants were copartners, with their principal place of business in the state of New York, engaged in the business of constructing hot-water heating systems in various cities of the United States. In 1900 they were constructing such a system in the city of Albert Lea, under the supervision of their representative, Mr. Ward, and for its installation in the various buildings to be heated it was necessary to dig ditches in which to lay pipes, mains, etc., and, among other things, the plans called for the placing of an iron pipe lengthwise across the inside of the central building, at a height of about nine feet from the ground. This pipe consisted of heavy cast-iron material ten or twelve inches in diameter, in sections weighing from three hundred to five hundred pounds each. In order to carry the pipe across the building, it was necessary to construct a scaffold of a height to accommodate the workmen in handling the sections of pipe and bolting them together. On the morning of a certain day, one Donnelly, an employee of defendants, was directed by the superintendent, Ward, to collect materials and construct a scaffold, which was done with the assistance of two other employees. After this scaffold was completed, Mr. Ward went to plaintiff, who was then at work digging ditches, and directed him to go inside the building and assist the men on the scaffold in putting the pipe in place. In obedience to this order,

plaintiff, with other employees, helped in pulling sections of the iron pipe from the ground upon the scaffold, and in fitting and bolting them into place, and while so engaged the scaffolding fell, throwing plaintiff and a section of the pipe to the ground, whereby he was injured.

It is charged by the plaintiff that defendants were negligent in constructing the scaffold; that it was not made of good material, nor securely fastened; that the plaintiff, wholly ignorant of its nature and requirements, and relying upon the representations of defendants as to the safety of the scaffold, went upon it in obedience to their command.

The defense interposed was that the scaffold was erected by first-class workmen, and suitable for the requirements for which it was intended; that the plaintiff knew how it was constructed, and worked upon it with knowledge of the danger, and that the scaffold broke by reason of the careless and negligent manner in which the employees did their work; and, further, that the scaffold was built by fellow workmen of plaintiff, and that, if it was not properly constructed, the fault was that of the fellow servants of plaintiff. Plaintiff having recovered a verdict, various assignments of error are assigned by defendants.

1. The question of the character of the material used in the scaffold being under consideration, respondent's witness was asked the following question:

"Judging from the way in which the timbers were broken to pieces and from the way they appeared after the scaffold had fallen, what would you say as to whether those timbers were brittle?"

This testimony was objected to upon the ground that it was immaterial, as appellants could not be liable for brittleness which appeared after the wood was broken. The object of the inquiry was to show that the lumber was brittle, and hence not safe for use in the scaffold, especially when constructed as this one was. If this were the only testimony in the case, and if it appeared that the condition of the lumber could not have been discovered by ordinary inspection before it went into the scaffold, but only from its condition after it was broken, then this method of proving

negligence could not be sustained. But it was proper to show the grade of the lumber as it appeared after the scaffold had fallen, provided there was other evidence in the case tending to show that the character of the lumber might have been discovered by ordinary inspection, and there was such evidence.

2. Certain witnesses testified as expert carpenters upon the question of the sufficiency of the scaffold for the work to which it was put, and objection was made upon the ground that they were not properly qualified to pass an opinion. They were working in and around the main building, and had opportunity to observe the scaffold, its method of construction, and the purpose to which it was being put; and it was not error to take their opinion.

3. One of the attorneys for respondent had directed a letter to appellants at their New York office, requesting settlement of the case, and containing a statement to the effect that respondent had complained to the foreman, Donnelly, that the scaffolding was not strong enough, but, being assured that it was safe, went upon it. At the trial appellants offered this letter in evidence for the purpose of showing that respondent assumed the risk attendant in working upon the scaffold, inasmuch as it showed that he had some knowledge of its insufficiency. The letter was inadmissible, for the reason that it appears to be no more than a statement of the attorney's version of the accident, and not a fact imparted to him by respondent.

4. The court instructed the jury to determine from the evidence whether or not the material for the scaffold was selected by the superintendent himself, or whether he simply pointed out a pile of lumber, and directed the foreman in charge of its construction to select therefrom the necessary material. The court also advised the jury that under such circumstances it was the duty of appellants to cause the scaffold to be constructed upon a safe and suitable plan; and further instructed that, if the scaffold fell because of defective workmanship, appellants would not be liable; that there were three things to be taken into consideration,—the workmanship of the men who put up the scaffold, the character and kind of material used in its construction, and the plan of its construction; that the plan of construction was one in respect to which

the master owed a duty to his servant; and that whoever planned the construction of the scaffold, so long as it was unknown to the respondent, represented the master, and, if it collapsed because of a defect in the plan, the master was liable. We think there was sufficient evidence in the case to go to the jury upon the question whether the superintendent, Mr. Ward, delegated absolutely to a foreman the selection of the material, or whether he himself directed such selection and construction.

It does not follow that appellants were not liable, even if the evidence conclusively shows that the superintendent had nothing to do with the selection of the material or the workmanship. Conceding that this work was delegated to the foreman, and that the timber was selected and the structure completed in the absence of Mr. Ward, yet it was a question of fact to be determined by the jury whether or not the scaffold had been constructed according to a plan suitable for the purpose to which it was to be subjected, and whether such apparatus or appliance was a reasonably safe and suitable one for the proposed purpose. There was evidence tending to show that the scaffold collapsed either because the material composing it was not suitable for the purpose, or was not put together in a proper manner, being insufficiently braced, or because not enough material was used to sustain the extra weight which it was to carry. If the master furnished a proper plan, but lumber was selected and the scaffold constructed by fellow workmen of plaintiff, and it collapsed because of weak material or poor workmanship, then the master would not be liable, unless from the nature of the use to which the appliance was to be subjected the master owed a duty to the respondent to see that it was properly constructed before directing him to engage in work upon it.

This was not a case within the fellow-servant doctrine as applied in Marsh v. Herman, 47 Minn. 537, 50 N. W. 611, and Oelschlegel v. Chicago G. W. Ry. Co., 73 Minn. 327, 76 N. W. 56, 409. In this case Ward was the sole representative of appellants, and his acts were binding upon his principals, so that to all intents and purposes he was the master. The scaffold in this instance was not such a temporary appliance as is referred to in making application

of the fellow-servant rule in the above cases. That principle applies only where the appliance is of such a character that the men who are constructing it, from the nature of the case, are presumed to have knowledge of the tests to which it is to be subjected; and hence, not only those directly engaged in its construction, but also fellow servants otherwise engaged, are held, as a part of their contract of employment, to assume risks attendant, under such conditions, upon the performances of their fellow servants.

But there are limitations to this doctrine. Here the scaffold was not only to bear the weight of the men upon it, but also the extra weight of hoisting up the different sections of iron pipe, and the strain it would undergo in lifting, shifting, and placing them in proper position. It was subject to further strain, caused in the following manner: As the different sections of the pipe were bolted together, the weight of the pipe became so great that it would not remain in position unless braced from below, and consequently, as the pipe was carried along over the scaffold towards the opposite end of the room, braces were placed upon the scaffold, resting under the pipe, for the purpose of holding it up. The ordinary workman, not experienced in the placing of such pipe, might not appreciate the conditions. In such a case only experience in that particular line of work would properly qualify a person to put up the requisite kind of scaffold, and therefore, under such circumstances, if the master directed respondent to go from the trenches where he was at work to assist the men in putting up the pipe, there was an implied agreement upon his part to the effect that the appliance was reasonably safe and suitable for the work in which he was to engage. Lafayette Bridge Co. v. Olsen, 47 C. C. A. 367, 108 Fed. 335; F. C. Mnfg. Co. v. Johnson, 32 C. C. A. 309, 89 Fed. 677.

Order affirmed.