Hillsborough, { No. 3045.
Feb. 7, 1939.

WILLIAM MARTIN *v.* BLANCHE KIMBALL.

*Thorp & Branch* (*Mr. Branch* orally), for the plaintiff.

*Wyman, Starr, Booth, Wadleigh & Langdell* (*Mr. Wyman* orally), for the defendants.

PAGE, J. The plaintiff's verdict was for damages resulting from injuries caused by the fall of a staging upon the defendant's premises. The sole question raised by the defendant is whether there was any evidence of negligence chargeable to her.

The evidence most favorable to the plaintiff would establish the following facts: The defendant owned a farm in Franklin with a house which was partially destroyed by fire in the spring of 1934. She had been living there with her husband and her son Donald for some years. Farming had not gone too well prior to the fire, and the buildings were rendered uncomfortable for residence. Consequently the defendant and her husband went to Manchester to live, Donald remaining on the farm to conduct it.

The son was not given a deed or lease, and the arrangement with him does not appear. He came home, after leaving college "to look after the farm about 1932," and "had charge of all the operations on the farm." He was solely in charge before the fire. The defendant and her husband resided there until the fire, and the whole family had their living out of the farm. What, if anything, the defendant

has got out of the farm since the fire does not appear, though she and her husband have resided there summers since 1935.

After the fire, the defendant used her insurance money to purchase materials for repairs, and some lumber was cut from the farm for that purpose. Her husband testified that she did not know much about the work, that she left it mostly to the son, that the son bought the materials, that all of the family were interested in the restoration. But he also testified that he worked with his son in making repairs, that he sometimes employed carpenters. As to certain lumber, he said that it was "sawed out especially for us." To a question about nails the husband said, "I bought them by the keg." In connection with other evidence as to the activities of the husband and the inactivity of the son, the jury might conclude that the husband was the leading spirit, not the son, and that the husband was acting for the defendant.

The day prior to the accident, the husband built a staging upon the premises for convenience in boarding the side of the house. The husband was competent to build a safe and sufficient staging, but it might be found that the structure was negligently built and that in consequence it fell with the plaintiff and caused the injuries for which the jury gave him a verdict.

The defendant stated in her deposition that prior to the accident, she had called up an employment agency to get a man to work on the farm. This, she testified at the trial, was not "just the truth," but the jury were at liberty to believe the earlier testimony. Asked in deposition whether, just before the accident, both she and her husband were trying to get a man for her son, she said, "I think I was leaving that to Mr. Kimball to do the scouting around for my son." At the trial she referred to the man chosen to work at the farm after the plaintiff was injured as "the man we chose for our son to interview, and that's the one who stayed with him while we were away."

On the morning of the accident, November 19, 1934, the husband went alone to the employment agency. Explaining, he testified, "My son asked me to get a man for him. That is why I went to the employment agency." At the agency, he met the plaintiff. "I told Mr. Martin about our fire and that we were planning—my son was planning—to rebuild the house and conduct the farm at the same time, and that I was going up and that he could ride with me." There was talk about other matters, including wages, but decision as to employment was deferred until the plaintiff could go to Franklin and see the farm. Arrived at the farm, the husband "showed [Martin]

the two rooms he would live in if he worked there, and I introduced him to my son." No agreement for hiring, he insisted, was made.

There is no evidence at all that the son interviewed the plaintiff, that he showed him about the place or expressed any interest in the plaintiff whatever. The plaintiff said that he had all his talk with the elder Kimball, and was shown about the farm by him; that he then accepted the employment on the terms talked in Manchester, that the talk was that the defendant's husband wanted to employ him. From all of the foregoing, the jury could well believe that Mr. Kimball hired the plaintiff in behalf of his wife, if also of his son, and that he did so with the defendant's authorization.

After the plaintiff had been hired, the defendant's husband went out upon the staging in order to nail on some siding. Though the evidence was conflicting, it could be found that Mr. Kimball asked the plaintiff to come upon the staging to help hold a board, that the plaintiff inquired as to the safety of the staging, was told by Mr. Kimball that it was all right, and went on as requested. The staging then fell.

Admitting that the plaintiff might be found to be the defendant's servant, counsel for defendant has urged upon us the view that nevertheless Mr. Kimball was his fellow-servant and that the defendant, having supplied materials ample for the staging, and left the erection to one competent for the work, is not liable for the negligence of her deputy in performing the work.

The conclusion suggested was reached in *Manning* v. *Mills*, 70 N. H. 582; *Robichaud* v. *Mendell*, 75 N. H. 391; *Frame* v. *Houston*, 78 N. H. 375, and *McIntyre* v. *McIntyre*, 86 N. H. 479. But that result depends much upon the theory that it is a duty of fellow-service to keep safe a place or instrumentality which constantly changes as the work progresses. *Robichaud* v. *Mendell, supra*; *McLaine* v. *Company*, 71 N. H. 294. The difficulty in a given case is to determine whether the situation is one of mere fellow-service or whether there is a master's duty to keep the place or instrumentality in a safe condition. If the negligence is in the performance of a master's duty by the master's agent, the master is liable for the consequences of such negligence. *Thompson* v. *Company*, 71 N. H. 174.

One test of the nature of the duty is the nature of the master's implied undertaking with regard to the instrumentality. If a staging is constructed, does the master undertake to furnish it completed, or is there an understanding that the plaintiff and his fellows should

build it as a part of their work? In the latter case, the only duty of the master is to supply enough suitable materials and to employ competent men to do the work. In the former case the master is liable for negligence of his employee's construction. *Haakensen* v. *Company*, 76 N. H. 443; *Winslow* v. *Wellington*, 79 N. H. 500; *Lucas* v. *Pietkevich*, 87 N. H. 148.

In the *Winslow* case the plaintiff was hired by Smith, who was doing construction work for the defendant. There was evidence that Smith was not an independent contractor, but subject to the defendant's control in details. Before Smith employed the plaintiff, Smith had built a staging on which the plaintiff was put to work. The jury were instructed that the defendant would be liable if they found four facts: (1) that Smith was not an independent contractor, but built the staging as the defendant's agent; (2) that Smith hired the plaintiff to work on the staging, (3) that the defendant provided the staging as a completed structure, (4) that the plaintiff's injuries were not caused in any degree by his contributory negligence. The charge was sustained.

There is no suggestion that the defendant's husband was an independent contractor. That she left everything to him is conceded, but it could nevertheless be inferred that he was subject to her control had she desired to direct him as to details. He could be found to have been her agent with plenary powers to do anything which he thought wise regarding the repairs on the house. She may have had no knowledge that a staging was built, but it does not necessarily follow that she assumed no obligation to furnish a completed staging. It could be found that her husband exercised his plenary powers (rather as her *alter ego* than as her workman) to build the staging. It could be found that the structure was complete when the plaintiff was hired and ordered to work on it. It positively appears that the level which fell, designed for first-story work, was separate from that intended for second-story work. As far as the evidence indicates, there would be no occasion to alter the staging as the work progressed.

It could properly be found that there was an implied undertaking to provide a completed structure. If so, the man whose hands built it was performing master's duties, not those of a fellow-servant. His later use of the structure with another employee does not necessarily determine his status while engaged in the erection. If he had dropped a hammer while nailing on the siding, he might then have been a fellow-servant of the plaintiff, but it does not conclusively

follow that while he was building the staging he was also engaged in fellow-service. The capacity in which he acted while building the staging depends upon circumstances. What might be fellow-service in the construction business as customarily conducted by contractors and sub-contractors may easily become something quite different when performed by an agent possessing plenary powers before there is any other servant of his principal. Even though an employee is in contemplation, if the agent prepares a work-place for the expected servant who is to work by his side, and the work-place is completed and not subject to change by the workers as they work, then there is surely ground for inferring that the principal has undertaken to furnish a completed instrumentality and that the agent who prepared it was performing a master's function and not that of an expectant fellow-servant.

Upon the evidence, all of the factors before us might be found to be substantially the same as those before the court in the *Winslow* case, with the single exception that Mr. Kimball was not a paid agent. Since he might nevertheless be found to be an agent, the distinction does not appear to be material.

The defendant took certain other exceptions during trial which appear to have been waived. Consequently they have not been considered.

*Judgment for the plaintiff.*

BRANCH, J., did not sit: the others concurred.